IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

UNITED STATES OF AMERICA : 
 :
 vs. : 3:CR-02-0249
 : (CHIEF JUDGE VANASKIE)
ANTOINE TUCKER :
 :

MEMORANDUM

Defendant Antoine Tucker was indicted for trafficking crack cocaine and unlawful

possession of firearms.  (Dkt. Entry 25.)  Defendant has moved to challenge the government's

case.  First, Tucker wishes to suppress crack cocaine seized from him following his arrest,

arguing the warrant for his arrest was invalid.  (Def.'s Mot. to Suppress All Physical Evidence,

Dkt. Entry 32.)  Second, he seeks to suppress allegedly coerced statements made by him

following his arrest.  (Def.'s Mot. to Suppress Any and All Statements, Dkt. Entry 38.)  Finally,

Tucker seeks to dismiss the indictment, claiming the government presented evidence to the

grand jury it knew or should have known was false.  (Def.'s Mot. to Dismiss the Superceding

Indictment, Dkt. Entry 53.)  A hearing on the motions was conducted on January 28, 2005.  The

motions have been fully briefed and are now ripe for decision.

Because Tucker's arrest was lawful, the crack cocaine found on Tucker's body will not

be suppressed.  Nor will this Court suppress statements made by Tucker following his arrest, as

he voluntarily offered the statements after being advised of his <u>Miranda</u> rights.  Finally, Tucker's indictment will not be dismissed as he fails to substantiate his claim that the government knowingly presented false evidence that influenced the grand jury's decision to indict him.

## I.  FINDINGS OF FACT

1.  In September 2002, a confidential informant notified the Scranton Resident Office of the United States Drug Enforcement Administration ("DEA") that Defendant Antoine Tucker was selling illegal drugs out of Apartment H-3, Sheridan Manor, Wilkes-Barre, Pennsylvania.  The apartment was the residence of Rachel Rogers.  In exchange for allowing him to sell drugs from the apartment, Tucker paid Rogers money.  (Test. of William Langan, Dkt. Entry 63 at 16-17; Test. of Antoine Tucker, Dkt. Entry 63 at 100.)

2.  The confidential informant met Tucker soon after he moved to Wilkes-Barre in August 2002.  He led the confidential informant to believe he could obtain crack cocaine for her.  (Test. of Antoine Tucker, Dkt. Entry 63 at 97, 142.)

3.  Special Agent William Langan of the Scranton DEA initiated an investigation of Tucker following the informant's tip.  Agent Langan had utilized the confidential informant twice before to identify crack cocaine dealers in the area.  He also knew that the confidential informant had a reliable reputation working with the Pittsburgh DEA.  The government paid the confidential informant for her assistance.  (Test. of William Langan, Dkt. Entry 63 at 16-19.)

4.  On September 13, 2002, a task force consisting of agents of the DEA and officers of

2

the Wilkes-Barre police department established a surveillance post outside Apartment H-3.  The

task force observed many people enter and leave the apartment during the surveillance, a

pattern indicative of drug trafficking.  (Id. at 20, 26.)

5.  Around 2:00 p.m., the task force sent the confidential informant into the apartment to

purchase crack cocaine while wearing a hidden recording device.  Before sending her into the

apartment, the task force confirmed that the informant did not already possess drugs by

searching her.  Because the task force did not consist of any female officers, however, the

search was limited to checking her purse and pockets.  (Id. at 20-21, 26.)

6.  Inside the apartment, the informant met with Tucker and Christopher Jones, a

juvenile who also trafficked in drugs.  They discussed purchasing a "ball" of crack cocaine,[1] but

had difficulty completing the transaction because they lacked a scale for measuring the drugs.

During discussions, two unidentified women entered the apartment and purchased "bundles" of

"dope" from Tucker.[2]  (Id. at 21-25.)

7.  After being in the apartment for nearly an hour, Agent Langan called the informant's

mobile phone and asked her to leave the apartment so he could change the tape in the

---

[1] A "ball" is short for an "eightball," which is slang for an eighth of an ounce.

[2] According to the government, "dope" commonly refers to heroin, which is frequently
sold in "bundles."  Defendant denies that he sold heroin, but instead claims he sold bundles of
hashish as "dope."  Resolution of this dispute is not necessary for this opinion.  It is significant,
though, that Tucker admits he sold illegal drugs from the apartment.  Moreover, it was
reasonable for the confidential informant to believe that the "dope" he was selling was heroin.

recording device.  Once outside, the informant told Agent Langan that she had not yet purchased any drugs.  (Id. at 21-22.)

8.  After placing a new tape in the recording device, the informant again entered the apartment to purchase crack cocaine.  Tucker was no longer in the apartment when the informant entered.  The informant proceeded to purchase an eighth of an ounce of crack cocaine from Jones.  (Id. at 22.)

9.  The informant transferred the drugs to agents of the task force upon exiting the apartment.  The drugs were later confirmed to be crack cocaine.  The informant also briefed Agent Langan about what had happened during her two trips inside the apartment.  During this debriefing, the informant told Agent Langan that Tucker identified a pistol in the apartment as a BB gun.  In truth, Rachel Rogers told the informant about the BB gun.  (Id. at 22-25.)

10.  Later that day, the informant entered the apartment for a third time.  She had again been searched beforehand for drugs by the task force.  Agent Langan also gave her a scale for weighing drugs.  Tucker was back inside the apartment when the informant entered.  The informant purchased an eighth of an ounce of crack cocaine while inside the apartment.  (Id. at 27-28.)

11.  After leaving the apartment, the informant gave the drugs to task force agents.  The drugs were later confirmed to be crack cocaine.  She informed the agents that she purchased the crack cocaine from Tucker.  The recording of the transaction confirmed that Tucker was

4

present for the weighing and transfer of the crack cocaine.  (Id. at 28-29.)

12.  On September 17, 2002, Agent Langan sought a search warrant for Apartment H-3 and arrest warrants for Tucker and Jones from Chief Magistrate Judge Thomas Blewitt of this Court.  In his supporting affidavit, Agent Langan explained the confidential informant's history with the DEA and indicated she received payment for her assistance.  The affidavit included the confidential informant's observations inside the apartment and the task force's observations outside the apartment.  The affidavit also mentioned that another confidential source within the Wilkes-Barre police department stated that Tucker distributed drugs from the apartment. Magistrate Judge Blewitt approved the search and arrest warrants.  (Exhibits in Supp. of Mot. to Suppress All Physical Evidence, Dkt. Entry 33, Ex. B.)

13.  On September 20, 2002, members of the task force went to Apartment H-3 to execute the search warrant and arrest Tucker and Jones.  Tucker was standing in front of Apartment H-3 with another man named Walter Georges when the task force arrived.  Georges immediately took flight upon seeing members of the task force.  Tucker submitted to the task force and was handcuffed and patted down.  (Test. of William Langan, Dkt. Entry 63 at 30-32.)

14.  Tucker was told to follow members of the task force into the apartment so they could execute the search warrant.  Tucker resisted being brought into the apartment, denying any association with it.  While being led up the stairways into the apartment, Tucker kicked backwards against the officer following him.  Members of the task force subdued Tucker using a

5

choke hold and dragged him into the apartment.  (Test. of Joseph Coffay, Dkt. Entry 63 at 60-62.)

15.  Inside the apartment, Tucker was placed on the floor of the living room with Jones and Georges, who had been quickly apprehended.  Officer Coffay of the Wilkes-Barre police office advised the group of their <u>Miranda</u> rights.  (<u>Id.</u> at 63.)

16. Tucker was later strip-searched in the back bedroom of the apartment.  During this search, a bag containing 3.1 grams of crack cocaine was found hidden between his buttocks. Tucker attempted to persuade the officers that the drugs were for personal use only.  (<u>Id.</u> at 65; Test. of William Langan, Dkt. Entry 63 at 48-50.)

17.  Afterwards, Officer Coffay asked Tucker some questions.  Officer Coffay hoped Tucker would cooperate with a larger dug trafficking investigation he was conducting.  Tucker did not provide much information to Officer Coffay, though he did admit that he sold crack cocaine.  (Test. of Joseph Coffay, Dkt. Entry 63 at 65-67.)

18.  Officer Coffay also questioned Jones, who stated that Tucker kept money and drugs in Apartment G-12 of the apartment complex.  The task force secured a search warrant for Apartment G-12 from a state magistrate.  While seeking entry into Apartment G-12, the confidential informant notified the task force that a woman had moved guns from the apartment to an abandoned apartment, Apartment G-15.  The task force eventually seized three guns and ammunition purportedly owned by Tucker.  (<u>Id.</u> at 88-92.)

19.  Tucker was transported to a local prison for booking.  He was denied admission, however, because he complained about a jaw injury.[3]  Tucker was then taken to a hospital for medical attention under the custody of the task force.  (Id. at 67.)

20.  At the hospital, Tucker was advised his Miranda rights a second time.  Officer Coffay questioned Tucker, who admitted he owned the guns seized by the task force.  Tucker also admitted he sold crack cocaine and planned to sell the drugs found on him.  He also discussed other people he knew who were involved in drug trafficking.  Tucker was taken back to prison after receiving medical attention.  (Id. at 67-70.)

21.  On October 8, 2002, Officer Coffay testified before a grand jury about the investigation of Tucker.  He testified about the confidential informant's two purchases of crack cocaine in Apartment H-3 on September 13, 2002.  He further testified about Tucker's arrest and the seizure of crack cocaine on his body.

22.  Officer Coffay also detailed the seizure of the guns and ammunition.  He recounted how Jones's statement initially led the task force to Apartment G-12.   He stated that a tip from the confidential informant and the unusual behavior of two people observing the task force eventually led them to the guns in Apartment G-15.  He theorized that the inhabitants of Apartment G-12 moved the guns when they saw the task force arrive at Apartment H-3.  (Id.)

---

[3] Tucker had broken his jaw in an accident a few weeks before his arrest.  He claims the task force's actions during his arrest aggravated his injury.

## II.  PROCEDURAL BACKGROUND

On October 8, 2002, the government filed a four-count indictment against Tucker.  (Dkt. Entry 1.)  A six-count superseding indictment was filed on September 25, 2004.  (Dkt. Entry 25.) The superseding indictment charges Tucker with the following violations: conspiracy to distribute and possess with intent to distribute cocaine base (crack) and heroin, in violation of 21 U.S.C. § 846 (Count 1); two counts of aiding and abetting in the distribution of cocaine base (crack), in violation of 21 U.S.C. § 841(a)(1) (Counts 2 and 3); possession with the intent to distribute cocaine base (crack), in violation of 21 U.S.C. § 841(a)(1) (Count 4); possession of firearms in relation to a drug trafficking felony, in violation of 18 U.S.C. § 924(c) (Count 5); and possession of firearms and ammunition while being an unlawful user of marijuana, in violation of 18 U.S.C. § 922(g)(3) (Count 6).  (Id.)   As noted above, a hearing on Tucker's motions was conducted in this matter.  The issues have been fully briefed, and the motions are ripe for disposition.

## III.  DISCUSSION

### A.  Suppression of Physical Evidence

Tucker claims his arrest and his subsequent search violated the Fourth Amendment. The Fourth Amendment of the United States Constitution provides: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause,

supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. CONST. amend. IV.  A valid arrest requires probable cause, meaning the existence of sufficient facts and circumstances to "warrant a prudent man in believing that the [suspect] had committed or was committing an offense." Beck v. Ohio, 379 U.S. 89, 91 (1964).  A police officer with probable cause does not need a warrant to make an arrest.  United States v. Watson, 423 U.S. 411, 423 (1976).  An arrest made pursuant to a magistrate's arrest warrant, however, will be afforded greater deference than a warrantless arrest.  See Aguilar v. Texas, 378 U.S. 108, 111 (1964) (concluding that the determination of probable cause by a "neutral and detached magistrate" is more reliable than by an "officer engaged in the often competitive enterprise of ferreting out crime").  Law enforcement officers are permitted to search a person incident to a lawful arrest.  See New York v. Belton, 453 U.S. 454, 457 (1981); Chimel v. California, 395 U.S. 752, 763 (1969).

Tucker claims the government's arrest warrant was invalid.  Consequently, he asserts that the search of his body incident to his arrest was unlawful.  He urges this Court to suppress the 3.1 grams of cocaine base (crack) found during the search of his body.  He presents three arguments for why the arrest warrant was invalid: (1) the confidential informant was untrustworthy and made false statements to members of the task force; (2) Agent Langan was not diligent in either confirming the confidential informant's assertions or drafting the affidavit; (3) the affidavit is premised upon lies that Tucker told the confidential informant in an effort to

seduce her.

Tucker's first attack on the validity of the arrest warrant is premised on his assertion that the confidential informant was untrustworthy.  In <u>Illinois v. Gates</u>, 462 U.S. 213 (1983), the Supreme Court introduced a "totality-of-the-circumstances" analysis for probable cause determinations based on information provided by an informant.  <u>Id.</u> at 233.  A magistrate making this probable cause determination should "make a practical, commonsense decision whether, given all the circumstances set forth in the affidavit before him, including the 'veracity' and 'basis of knowledge' of persons supplying hearsay information, there is a fair probability" that the suspect had committed a crime.  <u>See</u> <u>Id.</u> at 238.  Independent investigation may boost the reliability of information obtained from an informant.  <u>See</u> <u>Id.</u> at 243-44.

Tucker asserts that the confidential informant lacks veracity.  In support of his claim, he testified that he used drugs with the informant and also had sexual relations with her.  Tucker further asserts that the recordings indicate that the informant purchased crack cocaine from Jones during her first visit into the apartment without disclosing it to the task force.  Tucker lastly attacks the trustworthiness of the informant given the fact that she was paid for identifying drug traffickers.

Tucker's assertions do nothing to cast doubt on the validity of the arrest warrant.  The informant had a history in assisting law enforcement officers.  Independent corroboration, moreover, plainly substantiated the informant's account.  Observations by task force members,

10

taped conversations inside the apartment, and information from another confidential source all corroborated the informant's story that Tucker sold drugs from Apartment H-3.  Considering all the circumstances set forth in the warrant application, Chief Magistrate Judge Blewitt had ample grounds for concluding that the information attributed to the informant was such as could be relied on to find probable cause for the arrest warrants.

Tucker's second attack on the validity of the arrest warrant rests on his assertion that the warrant application contained false and misleading information.  In <u>Franks v. Delaware</u>, 438 U.S. 154 (1978), the Supreme Court held a defendant may challenge the issuance of a warrant if based on untruthful information.  <u>Id.</u> at 171.  The Court, however, cautioned that "[t]his does not mean 'truthful' in the sense that every fact recited in the warrant affidavit is necessarily correct, for probable cause may be founded upon hearsay and upon information received from informants, as well as upon information within the affiant's own knowledge that sometimes must be garnered hastily."  <u>Id.</u> at 165.  A defendant asserting that an affidavit has false information bears the burden of demonstrating by a preponderance of the evidence that (1) the misrepresentation was made in bad faith or in reckless disregard of the truth; and (2) that there would have been no probable cause but for the false information.  <u>See</u> <u>United States v. Frost</u>, 999 F.2d 737, 743 (3d Cir. 1993); <u>see</u> <u>also</u> <u>Franks</u>, 438 U.S. at 155-56.

In this case, Tucker argues that Agent Langan recklessly disregarded the truth by failing

to listen to the recorded conversations in the apartment before he completed his affidavit.[4]

Agent Langan admitted that he mainly reviewed the tape for sound quality, though he did listen to some contents of the tape to verify the informant's account.  A more exacting review of the tape certainly would have been preferable before completing the affidavit.

Nonetheless, Agent Langan's actions did not amount to "reckless disregard for the truth," as he had reason to believe the informant's assertions were truthful.  See Franks, 438 U.S. at 165.  Agent Langan had a basis for believing the informant, given his successful history working with her in the past.  The informant's story was also corroborated by independent evidence.  In light of these facts, it was reasonable for Agent Langan to rely on the informant's statements while completing his affidavit.

Tucker cites a minor misstatement in the affidavit to support his attack on its accuracy.  Specifically, the affidavit states that Tucker told the informant that a pistol laying in the apartment was a BB gun.  The government concedes that this statement is inaccurate, as someone other than Tucker actually told the informant about the BB gun.  The statement or who made the statement, though, would not be important in finding probable cause to believe that

_____

[4] A court may hold a Franks evidentiary hearing for challenges to the truthfulness of warrant applications.  During the January 28, 2005 hearing, Tucker challenged the truthfulness of statements in the warrant affidavit by introducing evidence and cross-examining the affidavit's author, Agent Langan.  Id.  The proceeding, therefore, met the requirements of a Franks evidentiary hearing.  See United States v. Lewis, 139 Fed. Appx. 455, 457 (3d Cir. 2005).

Tucker was engaged in drug trafficking.  See Franks, 438 U.S. at 171-72.  Therefore, this

misstatement does not significantly undermine the validity of the arrest warrant.

Tucker further protests that the wording of the affidavit was misleading.  In particular,

Tucker argues that paragraph six of Agent Langan's affidavit misleads the reader into thinking

that Tucker was present during the first drug transaction.  (Exhibits in Supp. of Mot. to Suppress

All Physical Evidence, Dkt. Entry 33, Ex. B, ¶6.)  This is because the paragraph mixes details

from the informant's first visit into the apartment, when Tucker was present, with her second

visit into the apartment, when Tucker was not present.  Ideally, the paragraph would have

clearly indicated that Tucker was not present when the informant purchased drugs during her

second entrance into the apartment.  Nonetheless, the paragraph does state that the purchase

was from Jones, not Tucker.  In addition, the statements in the paragraph are all accurate, other

than the one statement misidentifying who told the informant about the BB gun.  This case does

not present the type of "deliberate falsehood" or "reckless disregard" for the truth that Franks

shields against.  Id. at 171-72.

Tucker's final attack on the validity of the arrest warrant is his claim that he lied to the

informant about his ability to acquire crack cocaine in an effort to seduce her.  According to

Tucker, he was just a small-time marijuana dealer when the confidential informant asked him if

he knew where to purchase crack cocaine.  Because he wanted the confidential informant to

like him, he lied to her and said he could acquire crack cocaine.  This argument, though, does

not undermine the Magistrate Judge's finding of probable cause.  If anything, it actually

supports the government's claim that it had reason to believe Tucker sold crack cocaine.  Nor

did Tucker present any other legitimate reason for suppressing the evidence.  Therefore, his

motion to suppress all physical evidence will be denied.

### B.  Suppression of Statements

Tucker has also moved to suppress statements made after his arrest at both the

apartment and the hospital.[5]  He first seeks to suppress the statements as the fruit of an illegal

arrest, claiming the warrant for his arrest was invalid and thus his statements made subsequent

to the unlawful arrest should be suppressed.  For reasons already stated in this opinion,

Tucker's arrest was lawful.  Consequently, Tucker's suppression claim premised on this theory

lacks substance.

Tucker alternatively seeks to suppress his statements as the unlawful product of an

involuntary confession.  Initially, Tucker claims that he was not adequately advised of his

Miranda rights.  It is well-settled that an individual is entitled to Miranda warnings where the

government seeks to perform a custodial interrogation.  See Dickerson v. United States, 530

U.S. 428, 435 (2000).  Officer Coffay testified that Tucker was advised of his Miranda rights at

---

[5] Tucker contends that he did not actually make the incriminating statements alleged by the law enforcement officers.  Currently before this Court is whether the alleged statements should be suppressed.  Whether Tucker actually made the statements or not is an issue to be determined at trial.

14

the apartment and again at the hospital.  (Test. of Joseph Coffay, Dkt. Entry 63 at 63, 66, and

68.)  Tucker, on the other hand,  testified that he was not advised of his Miranda rights.  (Test.

Antoine Tucker, Dkt. Entry 63 at 117, 123.)  Thus, it becomes a question of credibility as to

whose account is accurate.

Tucker's testimony lacked the ring of truthfulness.  For instance, his claimed ignorance

about crack cocaine and heroin seemed suspect given the crack cocaine found on his body, the

cunning manner in which he hid the drugs on his body, and the taped conversations of him

discussing crack cocaine.  Because this Court finds Officer Coffay's testimony more credible

than Tucker's, this Court accepts Officer Coffay's testimony that Tucker was properly advised of

his Miranda rights before making his statements.

Tucker also argues that his statements were the product of physical and psychological

coercion.  Tucker first claims that he made statements at the apartment out of fear of physical

abuse.  The Fifth Amendment forbids confessions compelled by means of physical force.  See,

e.g., Miller v. Fenton, 796 F.2d 598, 603 (3d Cir. 1986).  Accordingly, a confession "must not be

extracted by any sort of threats or violence, nor obtained by any direct or implied promises,

however slight, nor by the exertion of any improper influence."  Malloy v. Hogan, 378 U.S. 1, 7

(1964) (quoting Bram v. United States, 168 U.S. 532, 542-43 (1897)).  A totality of the

circumstances approach is used to determine voluntariness.  See Schneckloth v. Bustamonte,

412 U.S. 218, 226 (1973).

15

Considering all the facts, I conclude that Tucker's statement was not physically coerced. There is no dispute that a physical struggle took place between Tucker and law enforcement officers after Tucker resisted being brought into the apartment.  I find, though, that the officers used reasonable force in subduing Tucker.  About an hour passed before Officer Coffay questioned Tucker about suspected drug traffickers in the area.  During this time, any fear of physical abuse following the struggle on the stairs should have subsided.  Perhaps most significantly, though, Tucker did exercise his right not to answer many of Officer Coffay's questions.  Thus, he obviously knew or should have known that he had the right not to make self-incriminating statements.

Tucker's final suppression argument is that his statements at the hospital were psychologically coerced.  Like physical coercion, the Fifth Amendment forbids psychological coercion.  See Miller, 796 F.2d at 603.  Voluntariness under psychological coercion is also assessed under a totality of the circumstances approach.  Id. at 604.  Factors to be considered include: "the youth of the accused; his lack of education or his low intelligence; the lack of any advice to the accused of his constitutional rights; the length of detention; the repeated and prolonged nature of questioning; and the use of physical punishment such as the deprivation of food or sleep."  Id. (citing Schneckloth, 412 U.S. at 226).

In this case, a weighing of all the factors does not lead to a finding that Tucker's statements at the hospital were psychologically coerced.  Tucker made his incriminating

statements at the hospital during the night of his arrest.  The record is not completely clear, but it appears he made the statements about twelve hours after his initial arrest.  He was not subjected to questioning for this entire period of time though.  In fact, Tucker was only subjected to a short interrogation at the apartment beforehand, where he demonstrated that he knew he could refuse to answer questions.  At the hospital, he was yet again advised his Miranda rights.  Though young, Tucker was an adult who had interacted with law enforcement officers in the past.  These circumstances do not suggest that Tucker's statements were made involuntarily.  See United States ex rel. Russo v. New Jersey, 438 F.2d 1343, 1347-48 (3d Cir. 1971) (finding an interrogation conducted in a hospital a day after the defendant's arrest was not psychologically coercive).

### C.  Dismissal of Indictment

Tucker finally seeks dismissal of the superseding indictment, claiming the government knowingly presented false evidence to the grand jury.  In order for an indictment to be dismissed based upon prosecutorial misconduct, a defendant must demonstrate that such conduct "substantially influenced the grand jury's decision to indict" or that there is "grave doubt" that the decision to indict was free from the substantial influence of such conduct.  See Bank of Nova Scotia v. United States, 487 U.S. 250, 255-56 (1988); see also United States v. Soberon, 929 F.2d 935, 939-40 (3d Cir. 1991); United States v. Serafini, 7 F. Supp. 2d 529, 545 (M.D. Pa. 1998).  This standard also applies to a claim of prosecutorial misconduct based on

the use of allegedly perjured testimony before a grand jury.  <u>Soberon</u>, 929 F.2d at 940.

Tucker points to five assertions the government made before the grand jury that Tucker claims the government knew or should have known were false.  First, the government falsely represented that a drug transaction did not take place during the informant's first entry into the apartment.  Tucker claims the informant actually purchased 7.5 grams of crack cocaine from Jones at this time and hid it from the task force.  Second, the government falsely represented that the drugs that Jones sold to the informant came from Tucker, when they really came from a person named Capone.  Third, the government falsely represented that Tucker handed crack cocaine to the informant during the second transaction, when the drugs were actually handed to the informant by a woman named Lizzie.[6]  Fourth, the government falsely represented that Jones had told Officer Coffay that Tucker stored guns in Apartment G-12.  Fifth, the government falsely represented that a person in Apartment G-12 could see law enforcement officers entering Apartment H-3.  Tucker fails, however, to demonstrate the validity of his assertions or whether they substantially influenced the grand jury's decision to indict.

Tucker fails to substantiate his first claim that the informant purchased crack cocaine during her initial visit into the apartment and hid it from the task force.  He bases his claim on a taped conversation between the informant and Jones where they appear to be negotiating a

---

[6] Lizzie apparently is a woman who was in the apartment when the informant made her second drug purchase on September 13, 2002.  Her relationship to Tucker or the apartment is not clear from the record.

18

price for drugs.  Tucker argues that this shows that a transaction occurred at this time, while the

government claims it was merely a negotiation.  No crack cocaine from this alleged transaction

was ever recovered.  It certainly is not clear from this evidence that a drug transaction occurred.

Accordingly, Tucker has not shown the knowing presentation of false testimony to the grand

jury.

Tucker's second claim – that Capone rather than Tucker supplied drugs to Jones – fails

to undermine the government's allegations before the grand jury.  The government represented

that Tucker was involved in the negotiations for the first drug transaction in support of its charge

that Tucker aided and abetted Jones in selling crack cocaine to the informant.  (See Indictment,

Dkt. Entry 25, Count 2.)  Regardless of whether Tucker or Capone supplied Jones the crack

cocaine, Tucker aided and abetted the transaction.  Thus, Tucker fails to show how this error,

even if true, casts grave doubt on the grand jury indictment.

Tucker's third claim is, at best, just a minor clarification of the evidence the government

presented to the grand jury.  Tucker claims a woman called Lizzie physically handed the crack

cocaine to the informant during the second transaction, not him.  Tucker's claim is, to say the

least, suspect.  There is, moreover, abundant evidence that Tucker was an active participant in

the second drug transaction.  The recordings clearly show him involved in the weighing and sell

of the drugs to the informant.  Whether he physically handed the crack cocaine to the informant

is irrelevant; the government presented adequate evidence to show that he aided and abetted

in this drug transaction.  Therefore, Tucker fails to establish that this error, if true, substantially influenced the grand jury's decision to indict.

Tucker's fourth claim – that Jones did not tell Officer Coffay that Tucker stored guns in Apartment G-12 – also does not warrant dismissal of charges.  Tucker did present evidence that casts some doubt on Officer Coffay's assertion, such as Officer Coffay's failure to mention Jones's statement in his investigation report.  Nonetheless, the government produced enough independent evidence to warrant an indictment against Tucker in connection with the recovered firearms.  Tucker is certainly free to present evidence at trial that he did not own the guns.  Yet, it is not proper to dismiss the grand jury's indictment based on this argument.

Tucker's final claim also lacks merit.  In his testimony before the grand jury, Officer Coffay suggested that guns were moved from Apartment G-12 to Apartment G-15 when inhabitants observed law enforcement officers raiding Apartment H-3.  Tucker complains that it is impossible to observe officers in front of Apartment H-3 from inside Apartment G-12.  This is far too exacting a reading of Officer Coffay's testimony.  Apartment G-12 and Apartment H-3 were part of the same apartment complex.  Though a direct line of sight between the two apartments may not exist, it is reasonable that a resident in Apartment G-12 would be aware of the commotion produced by a police raid of a neighboring apartment.  For instance, a foot chase occurred when Georges fled from the uniformed officers.  Tucker, as well, was arrested outdoors.  From this information, it does not seem patently false that an inhabitant in Apartment

G-12 would have been aware of the police raid on Apartment H-3.  Certainly, the evidence does not support a conclusion of misconduct before the grand jury.

In summation, Tucker fails to show the government knowingly presented any false evidence of significance to the grand jury.  Accordingly, the motion to dismiss the superceding indictment will be denied.

## IV.  CONCLUSION

Tucker does not deny that he sold drugs from Apartment H-3, but instead argues the government has misidentified him as a major crack cocaine dealer.  He claims that he lied about connections to crack cocaine in an effort to impress the government's confidential informant.  This story, however, does not support an inference that the government acted improperly in any respect in arresting and prosecuting Tucker.  Finally, the government fairly presented its case against Tucker to the grand jury.  Therefore, the Defendant's motions attacking the government's prosecution of his case lack merit.  An appropriate Order follows.


s/ Thomas I. Vanaskie
Thomas I. Vanaskie, Chief Judge
Middle District of Pennsylvania


Dated: January 3, 2006

21

IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA


UNITED STATES OF AMERICA          :
                                  :
        vs.                       :        3:CR-02-0249
                                  :        (CHIEF JUDGE VANASKIE)
ANTOINE TUCKER                    :
                                  :

O R D E R

NOW, THIS 3rd DAY OF JANUARY, 2006, for the reasons set forth in the foregoing

Memorandum, IT IS HEREBY ORDERED THAT:

    1.  Defendant's motion to suppress all physical evidence (Dkt. Entry 32) is DENIED.

    2.  Defendant's motion to suppress statements made by Antoine Tucker (Dkt. Entry 38)

is DENIED.

    3.  Defendant's motion to dismiss the superceding indictment (Dkt. Entry 53) is DENIED.

    4.  A telephonic scheduling conference will be conducted on January 31, 2006, at 10:00

a.m.  Counsel for the government is responsible for making the arrangements for the

conference call.

                                          s/ Thomas I. Vanaskie
                                          Thomas I. Vanaskie, Chief Judge
                                          Middle District of Pennsylvania